**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

ABDULWALI MOHAMED
SUWAILEH,

                                        CIVIL ACTION NO. 18-10170
          *Plaintiff*,                  DISTRICT JUDGE ROBERT H. CLELAND
                                        MAGISTRATE JUDGE PATRICIA T. MORRIS
*v.*

COMMISSIONER OF SOCIAL SECURITY,

          *Defendant.*
_____/

## REPORT AND RECOMMENDATION ON CROSS-MOTIONS FOR SUMMARY JUDGMENT
(Docs. 13, 16)

## I. RECOMMENDATION

In light of the entire record in this case, I suggest that substantial evidence supports the Commissioner's determination that Plaintiff is not disabled. Accordingly, **IT IS RECOMMENDED** that Plaintiff's Motion for Summary Judgment, (Doc. 13), be **DENIED**, the Commissioner's Motion for Summary Judgment, (Doc. 16), be **GRANTED**, and this case be **AFFIRMED**.

## II. REPORT

### A. Introduction and Procedural History

This is an action for judicial review of a final decision by the Commissioner of Social Security denying Plaintiff Abdulwali Mohamed Suwaileh's claim for Disability Insurance Benefits (DIB) under Title II, 42 U.S.C. § 401 *et seq.* (Doc. 1). Pursuant to 28

1

U.S.C. § 636(b)(1)(B), E.D. Mich. LR 72.1(b)(3), and by Notice of Reference, this case was referred to the undersigned Magistrate Judge. (Doc. 3). Currently before the Court are Plaintiff's and Defendant's cross-motions for summary judgment (Docs. 13, 16).

Plaintiff filed an application for DIB on January 20, 2015, alleging onset on June 27, 2014. (PageID.180-186).[1] His claim was denied at the initial level in October 2015. After an administrative hearing held at Plaintiff's request, (PageID.59-90), Administrative Law Judge (ALJ) Elias Xenos issued a decision finding Plaintiff had not been under a disability from the alleged onset date of June 27, 2014, through the date of the decision, May 2, 2017. (PageID.40-58). The Appeals Council denied Plaintiff's request for review. (PageID.29-36). This action followed. (Doc. 1).

### B.  Standard of Review

The district court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). The district court's review is restricted solely to determining whether the "Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Sullivan v. Comm'r of Soc. Sec.*, 595 F App'x. 502, 506 (6th Cir. 2014) (internal quotation marks omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted).

---

[1] Plaintiff indicated in his initial DIB application that he also had filed or intended to file for Social Security Insurance (SSI), (PageID.180), but no SSI claim appears in the record.

The Court must examine the administrative record as a whole, and may consider any evidence in the record, regardless of whether it has been cited by the ALJ. *See Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). The Court will not "try the case de novo, nor resolve conflicts in the evidence, nor decide questions of credibility." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Id.*

### C. Framework for Disability Determinations

Under the Act, "DIB and SSI are available only for those who have a 'disability.'" *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means the inability

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI).   The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> (i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled. . . .
>
> (ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . or a combination of impairments that

is severe and meets the duration requirement, we will find that you are not disabled. . . .

(iii) At the third step, we also consider the medical severity of your impairment(s). If you have an impairment(s) that meets or equals one of our listings in appendix 1 of this subpart and meets the duration requirement, we will find that you are disabled. . . .

(iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled. . . .

(v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. §§ 404.1520, 416.920. *See also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by her impairments and the fact that she is precluded from performing her past relevant work." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003). A claimant must establish a medically determinable physical or mental impairment (expected to last at least twelve months or result in death) that rendered him unable to engage in substantial gainful activity. 42 U.S.C. § 423(d)(1)(A). The burden transfers to the Commissioner if the analysis reaches the fifth step without a finding that the claimant is not disabled. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform given [his or] her

RFC [residual functional capacity] and considering relevant vocational factors." *Rogers*, 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)).

### D. ALJ Findings

Following the five-step sequential analysis, the ALJ found Plaintiff had not been under a disability from the alleged onset date of June 27, 2014, through the date of the decision, May 2, 2017. (PageID.43-54). At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since the alleged onset date. (PageID.45). Next, he determined Plaintiff had the following severe impairments: degenerative disc disease of the cervical and lumbar spine; diabetes mellitus; hypertension; bilateral sensorineural hearing loss; subjective tinnitus; vertigo; and major depressive disorder. (*Id.*). Additionally, he had the non-severe impairments hyperlipidemia and gastroesophageal reflux disease. (*Id.*). He did not, however, have an impairment or combination of impairments that met or medically equaled the severity of a listed impairment. (PageID.46-48). Before proceeding further, the ALJ found Plaintiff had the residual functional capacity (RFC) to perform medium work as defined in 20 C.F.R. § 404.1567(c)

> except can never climb ladders, ropes or scaffolds, crawl or kneel; can occasionally climb ramps and stairs, balance, stoop and crawl; limited to occupations that do not require fine hearing capabilities; limited to occupations that do not require complex written or verbal instructions; limited to a work environment free of fast-paced production requirements; can have only occasional interaction with the general public and coworkers.

(PageID.48). At steps four and five, he concluded Plaintiff was unable to perform any relevant past work, but that jobs that he could perform existed in significant numbers in the national economy. (PageID.52-54). Thus, the ALJ determined that Plaintiff had not been

under a disability as defined in the Social Security Act during the relevant time period. (PageID.54).

### E.  Administrative Record

#### 1.  Medical Evidence

The Court has reviewed Plaintiff's medical record. In lieu of summarizing his medical history here, the Court will make references and provide citations to the record as necessary in its discussion of the parties' arguments.

#### 2.  Application Reports and Administrative Hearing

##### i.  Plaintiff's Function Report

Plaintiff completed a function report on February 16, 2015. (PageID.231-238). He indicated he lived in a house with his family but did not take care of anyone else, such as his wife or children. (PageID.231-232).

Plaintiff explained: "I like to work but my injuries stop me from working." (PageID.231). Instead, from the time he woke up until going to bed, he sat down "all day." (PageID.232). Asked about his hobbies and interests, he wrote, "I only like to sit alone." (PageID.236). Previously, he had been able to work and drive. (PageID.232).

Asked about his personal care, Plaintiff wrote only that he had "no care for any grooming or personal care," and that his wife helped him in the bathroom when needed. (*Id.*). Due to his "bad memory," he needed reminders to tend to his personal needs and grooming, and to take his medication. (PageID.233). He did not prepare his own meals. (*Id.*). He was not able to do any household chores "because of my conditions." (PageID.233-234).

Plaintiff went outside "not much." (PageID.234). He could not go out alone because he would become nervous. (*Id.*). Nor did he drive, due to his "bad memory." (*Id.*). He did not shop. (*Id.*). His wife took care of all financial matters; Plaintiff "can't handle money anymore because I lose touch." (PageID.234, 236).

Asked whether he had problems getting along with family, friends, neighbors, or others, Plaintiff responded, "Not sure." (PageID.235). He was similarly unsure whether he got along well with authority figures, although he had never been fired or laid off from a job because of problems getting along with other people. (PageID.237). He did not spend time with others. (PageID.236). The only places he went on a regular basis were doctor appointments, to which he needed someone to accompany him. (*Id.*).

His illnesses, injuries, or conditions affected his ability to bend, stand, reach, walk, talk, climb stairs, complete tasks, concentrate, understand, follow instructions, and use his hands, as well as his memory. (PageID.235). He explained: "My abilities have been affected by injuries." (*Id.*).

Plaintiff estimated he could walk ten to fifteen yards before needing to rest for a minute. (*Id.*). He could pay attention "not long," did not finish what he started, and could follow neither written nor spoken instructions well. (*Id.*). He handled stress and changes in routine poorly. (PageID.237). As for whether he had noticed any unusual behaviors or fears, he wrote, "I am scared and paranoid." (*Id.*). Further, nightmares troubled his sleep. (PageID.232).

He did not mark that he used a cane or any other ambulatory device. (PageID.237). His medications—Vicodin, Klonopin, Seroquel, Paxil, and Celexa—made him dizzy, tired, and drowsy, and caused headaches. (PageID.238).

### ii.  Third Party Function Report

Plaintiff's wife, Farheya Suwailen, also completed a third party function report on February 16, 2015. (PageID.223-230). She described him as "in very bad shape" and unable to work due to his conditions. (PageID.223). "He just sits around all day not do[ing] much. . . . He has no interests at all. He just likes sitting alone." (PageID.224, 227). Previously, he had been able to work, drive, cook, and care for his children. (*Id.*). "He never used to like staying at home all day [but] now that's all he does." (PageID.227).

As for personal care, he had "no interest" in dressing, bathing, caring for his hair, shaving, feeding himself, and so on; Plaintiff's wife usually helped him. (*Id.*). He needed reminders to take care of his personal needs and grooming, and to take his medicine, because he had a bad memory. (PageID.225). Since he was "not allowed in the kitchen due to his lack of memory and concentration," he did not prepare his own meals. (*Id.*). He could do no household chores; doctors had "told him not to due to his conditions." (PageID.225-226).

Like Plaintiff, she said he went outside "not much." (PageID.226). He did not go out alone because he got "very anxious and nervous," and did not drive because he lost "focus and concentration." (*Id.*). He did not shop. (*Id.*). His wife handled all the finances— "He used to be sharp but not anymore." (PageID.227). Additionally, he had trouble getting along with others because "he would rather be alone," and had become "more quiet and

hostile." (PageID.228).      As Plaintiff had, his wife reported that doctors' appointments were the only places he went on a regular basis. (PageID.227).

Plaintiff's wife indicated his illnesses, injuries, or conditions affected his ability to lift, bend, stand, reach, walk, climb stairs, see, complete tasks, understand, follow instructions, and get along with others, in addition to his memory. (*Id.*). She estimated he could walk twenty yards before needing to stop and rest for one minute. (*Id.*). Moreover, Plaintiff could pay attention for only a "very short" time, did not finish what he started, and struggled to follow both written and spoken instructions. (*Id.*). He handled stress and changes in routine poorly. (PageID.229). His nightmares and paranoia affected his sleep. (PageID.224).

Plaintiff's wife also did not indicate he used any ambulatory aids. (PageID.229). She repeated Plaintiff's complaints about his medications causing side effects. (PageID.230).

### iii.  Plaintiff's Testimony at the Hearing

An administrative hearing was held in Plaintiff's case on January 17, 2017, with ALJ Elias Xenos presiding. (PageID.59-90). Samira Rehal interpreted for Plaintiff, who also spoke "a little bit" of English. (PageID.61).

At the time of the hearing, Plaintiff was 56 years old and living with his wife and their six children, the oldest of whom was thirty and the youngest thirteen. (PageID.65-66). He was not currently working. (PageID.66). From July 1998 to July 2012, he had worked on a ship as a gate man and a wheels man. (PageID.69-70). He had last worked in June 2014 as a wheels man on a ship, spending half his time "on the wheel" and half "at the

back." (PageID.66-67). He spent most of the day on his feet, and was required to lift a maximum of forty pounds. (PageID.83).

He left work when his hearing was damaged by the ship's horn sounding twice without warning. (PageID.67). After six months, his hearing improved, but "dizziness and some kind of chaos in [his] head" remained. (PageID.68). He also suffered from balance problems, high blood pressure, and diabetes. (PageID.68). Sometimes when he stood he became dizzy, and walking felt like he was balancing on beads. (PageID.68-69). Plaintiff used a cane for balance "[m]ost of the time," and he had it with him on the day of the hearing. (PageID.70). But he said he tried as much as he could not to use it. (*Id.*).

Plaintiff tried "to live a normal life," and spent a typical day "busy with [his] children at home," but said that he did not play games with them or help them with homework and that "at times [he had] to get away from them a lot." (PageID.71). At those times he would stay in his room. (PageID.71). He got out of the house "sometimes" and went walking. (PageID.72). He would go shopping with his children, for example, to Wal-Mart to buy them clothes. (*Id.*). He would sometimes "try to drive," but sometimes his older children would drive him instead. (*Id.*). He did not do any chores outside or attend any religious services. (*Id.*). He "sometimes" used his phone. (PageID.73). He could not write in English but did try to read. (PageID.73).

Next, Plaintiff described some of his medical treatment. He saw Dr. Rahim for his diabetes, high blood pressure, cholesterol, and hormones. (PageID.74). He also had psychiatric problems: "I'm always worried about my life and the life of my children, the future of my children. It grieves me so much. Fear." (*Id.*). Since July 2014, he had had pain

in his neck, left shoulder, left leg, and back, which had been treated with medication and injections. (PageID.75, 80). Plaintiff described the pain as an eight out of ten, which the injection would reduce to a five or six. (PageID.76). The pain worsened when he tried to be active, and with his depression. (*Id.*).

Mentally, he had trouble focusing and finishing tasks, even an episode of "a good show" on television. (PageID.76-77). He could sit "[f]ive good minutes" and often got up and down. (PageID.77). At most, he could walk a few minutes around his house. (PageID.78-79). He could lift up to ten pounds. (PageID.81).

His medication seemed to help, but also sedated him. (PageID.79). He normally took his medications and then went to bed early and got up early, but did not sleep through the night because of nightmares. (PageID.80). He cried "a lot": for about two minutes, twice a day. (PageID.81).

Finally, Plaintiff testified that he saw Dr. Mediratta once a month, and Dr. Rahim two or three times a month. (PageID.81).

### iv.  The Vocational Expert's Testimony at the Hearing

Vocational Expert (VE) Stephanie Leach also testified. (PageID.84-90). She began by classifying Plantiff's past work as "an able seaman," which is skilled work, coded at heavy, performed at medium, with no transferable skills. (PageID.84).The ALJ then posed his first hypothetical:

> Assume an individual of the claimant's age, education, and work experience who is able to perform medium work activities as defined in the regulations with the following regulations. [sic] Occasionally climbing ramps and stairs, never climbing ladders, ropes, or scaffolds. Occasionally balancing, occasionally stooping, occasionally crouching, never crawling and never

11

> kneeling. . . . [L]imited to occupations that do not require fine hearing capability or complex written or verbal instructions. Limited to work free of fast paced production requirements. Only occasional interaction with the general public and coworkers.

(PageID.84-85). The VE testified that such a person would not be able to perform Plaintiff's past work because it had required frequent climbing, frequent balancing, occasional stooping, occasional kneeling, and occasional crouching, though no crawling. (PageID.85). There would be available a reduced range of inspector (12,000 jobs nationally), packer (120,000 jobs nationally), and food preparation positions (90,000 jobs nationally). (PageID.87). If the ALJ added an additional limitation prohibiting work around unprotected heights or hazardous machinery, the same jobs would be available in the same numbers. (PageID.87-88). A final limitation that the person would be off task 15 percent of the day or more, or take more breaks than scheduled, would eliminate all jobs in the national economy. (PageID.88-89). More than one absence per month would also be work preclusive. (*Id.*). Further, as all of the above jobs required bilateral manual dexterity, Plaintiff would not be able to perform those jobs if he needed to stand and use a cane with one hand. (PageID.89).

If the exertion level in the first hypothetical were changed to light, and an additional restriction were added that the person must use an assistive device for ambulating such as a cane, the person would not be able to do Plaintiff's past work. (PageID.86). He would, however, be able to work in a reduced range of bench assembly (40,000 jobs nationally), packer (250,000 jobs nationally), and inspector positions (100,000 jobs nationally). (PageID.86).

Finally, the VE certified that her testimony was consistent with the Dictionary of Occupational Titles except as to "duty stuff, such as time off task, use of a cane to walk, proximity to others, [and] production and pace," and on those subjects her opinion was based on her professional experience. (PageID.88).

### F.  Governing Law

The ALJ must "consider all evidence" in the record when making a disability decision. 42 U.S.C. § 423(d)(5)(B). The regulations carve the evidence into categories: "acceptable medical sources" and "other sources." 20 C.F.R. § 404.1513. "Acceptable medical sources" include, among others, licensed physicians and licensed or certified psychologists. *Id.* § 404.1513(a). "Other sources" include medical sources who are not "acceptable" and almost any other individual able to provide relevant evidence. *Id.* § 404.1513(d). Only "acceptable medical sources" can establish the existence of an impairment. SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006). Both acceptable and non-acceptable sources provide evidence to the Commissioner, often in the form of opinions "about the nature and severity of an individual's impairment(s), including symptoms, diagnosis and prognosis, what the individual can still do despite the impairment(s), and physical and mental restrictions." *Id.* When acceptable medical sources issue such opinions, the regulations deem the statements to be "medical opinions" subject to a multi-factor test that weighs their value. 20 C.F.R. § 404.1527. Excluded from the definition of "medical opinions" are various decisions reserved to the Commissioner, such as whether the claimant meets the statutory definition of disability and how to measure her RFC. *Id.* § 404.1527(d).

The ALJ must use a six-factor balancing test to determine the probative value of medical opinions from acceptable sources. 20 C.F.R. § 404.1527(c). The test looks at whether the source examined the claimant, "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and specialization of the treating source." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); *see also* 20 C.F.R. § 404.1527(c). ALJs must also apply those factors to "other source" opinions. *See Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 540-42 (6th Cir. 2007); SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006).

Certain opinions of a treating physician receive controlling weight if they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and are "not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2); *see also Wilson*, 378 F.3d at 544. The only opinions entitled to dispositive effect deal with the nature and severity of the claimant's impairments. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at *1-2 (July 2, 1996). Therefore, the ALJ does not owe a treating opinion deference on matters reserved to the Commissioner. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at *1-2 (July 2, 1996). The ALJ "will not give any special significance to the source of an opinion" regarding whether a person is disabled or unable to work, whether an impairment meets or equals a Listing, the person's RFC, or the application of vocational factors. 20 C.F.R. § 404.1527(d)(3).

The regulations mandate that the ALJ provide "good reasons" for the weight assigned to a treating source's opinion in the written determination. 20 C.F.R. §

14

404.1527(c)(2); *see also Dakroub v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir.

2007). Therefore, a decision denying benefits

> must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's opinion and the reasons for that weight.

SSR 96-2p, 1996 WL 374188, at *5 (July 2, 1996); *see also Rogers*, 486 F.3d at 242.

For example, an ALJ may properly reject a treating source opinion if it lacks

supporting objective evidence. *Revels v. Sec'y of Health & Human Servs.*, 882 F. Supp.

637, 640-41 (E.D. Mich. 1994), *aff'd*, 51 F.3d 273 (Table), 1995 WL 138930, at *1 (6th

Cir. 1995).

The claimant must provide evidence establishing his RFC. The statute lays the

groundwork for this, stating, "An individual shall not be considered to be under a disability

unless he furnishes such medical and other evidence of the existence thereof as the

Secretary may require." 42 U.S.C. § 423(d)(5)(A); *see also Bowen*, 482 U.S. at 146 n.5.

The RFC "is the most he can still do despite his limitations," and is measured using "all

the relevant evidence in [the] case record." 20 C.F.R. § 404.1545(a)(2).

### G. Analysis

Plaintiff rests his claim of error on three main grounds: (1) that the ALJ did not

properly evaluate his mental limitations; (2) that substantial evidence does not support that

he is capable of medium work activity, even with additional limitations; and (3) that the

ALJ did not properly assess Plaintiff's statements about his pain and functional limitations.

### 1.  The ALJ's evaluation of Plaintiff's mental limitations

Plaintiff asserts that the ALJ's evaluation of his mental limitations was insufficient for several reasons. First, he contends that the ALJ failed to follow SSR 96-9p, which requires evaluating his "ability to deal with changes in a routine work setting" and "to make judgments or simple work-related decisions." (Doc. 13 at PageID.1003). To begin, I note that SSR 96-9p regards the "implications of a residual functional capacity for less than a full range of sedentary work," and Plaintiff here was found limited to a range of *medium* work—making this SSR seem irrelevant. *See Graber v. Colvin*, 2013 WL 3884182, No. 1:12-cv-345 at *3 (S.D. Ohio July 26, 2013) (finding SSR 96-9p irrelevant where the ALJ found the plaintiff capable of performing a full range of work, not only sedentary work), *rep. & rec. adopted*, 2013 WL 4484609 (S.D. Ohio Aug. 21, 2013). Regardless, SSR 96-9p simply outlines four "mental activities . . . generally required by competitive, remunerative, unskilled work," and concludes that "[w]hen an individual has been found to have a limited ability in one of more of these basic work activities, it may be useful to consult a vocational resource." It does not mandate an explicit discussion of all or any of the listed abilities in the ALJ's opinion. SSR 96-9p, 1996 WL 374185. In addition, the ALJ did question the VE to determine the type of work Plaintiff could perform with his mental limitations.

Next, Plaintiff complains that the ALJ does not mention or address 20 C.F.R. § 404.1520a(c)(2). (Doc. 13 at PageID.1003). Failure to mention 20 C.F.R. § 404.1520a is not necessarily reversible error, however. *Turcus v. Soc. Sec. Admin.*, 110 F. App'x 630,

632 (6th Cir. 2014). The ALJ need only evaluate the claimant's mental limitations as required:

> We will rate the degree of your functional limitation based on the extent to which your impairment(s) interferes with your ability to function independently, appropriately, effectively, and on a sustained basis. Thus, we will consider such factors as the quality and level of your overall functional performance, any episodic limitations, the amount of supervision or assistance you require, and the setting in which you are able to function.

20 C.F.R. § 404.1520a(c)(2). The regulations go on to explain what that should look like; the ALJ should rate a claimant's degree of functional limitation in four functional areas: "Understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself." *Id.* at § 404.1520a(c)(3). The ALJ rates the claimant's degree of limitation in each area on a five-point scale: none, mild, moderate, marked, or extreme. *Id.* at § 404.1520a(c)(4).

Here, the ALJ did just as the regulations require. He found Plaintiff had mild limitations in understanding, remembering, or applying information; moderate limitations in interacting with others; moderate limitations in concentrating, persisting, or maintaining pace; and mild limitations in adapting or managing himself. (PageID.47). Thus, I suggest the ALJ satisfied the requirements of 20 C.F.R. § 404.1520a, and the absence of a direct citation does not warrant reversal.

Plaintiff also remarks that the RFC "does not contain a function-by-function assessment of the claimant's ability to do work-related mental activities," pointing to SSR 96-8p's requirement that a claimant's RFC be founded on a function-by-function assessment of the claimant's exertional (lifting, carrying, standing, walking, sitting,

pushing, and pulling) and non-exertional (manipulative, postural, visual, communicative, and mental functions) capacities. (Doc. 13 at PageID.1003). The Sixth Circuit rejected a similar argument, however, where the ALJ still discussed the medical and other evidence on disputed issues and explained the basis for his determination of the claimant's RFC. *Delgado v. Comm'r of Soc. Sec.*, 30 F. App'x 542, 547–48 (6th Cir. 2002).

As in *Delgado*, I suggest the ALJ also sufficiently discussed the evidence here. He discussed Plaintiff's testimony regarding his mental health, including that he worries about his life and the future of his children, experiences crying spells and nightmares, and has trouble concentrating. (PageID.49). He also made note of Plaintiff's activities of daily life, including that he is able to drive a car and use a cell phone, watch television (though he testified he struggles to finish an episode), and go shopping with his children. (PageID.47). Plaintiff did challenge the ALJ's finding that his "statements concerning the intensity, persistence and limiting effects of [his] symptoms are not entirely consistent" with the record evidence; that challenge is discussed in more detail below. The ALJ also considered the function report submitted by Plaintiff's wife, but gave it little weight (a finding Plaintiff has not challenged). (PageID.52).

Further, the ALJ noted that Plaintiff received psychiatric medication management for his depression through his primary care provider. (PageID.50). At a September 2014 neurological consult, Plaintiff's attention, concentration, and mood were normal, and his affect was appropriate. (*Id.*). Again, at a January 2015 neurology visit, his attention, concentration, and mood were normal. (*Id.*).

18

The ALJ discussed psychiatrist Madhu Mendiratta's evaluation of Plaintiff, which advised that Plaintiff experiences severe depression, anxiety, and insomnia, as well as paranoia and difficulty concentrating and getting along with others. (PageID.50-51). He observed that although Dr. Mendiratta indicated he had been treating Plaintiff since August 2014, he provided treatment notes only dating back to January 2016. (PageID.51). And he acknowledged Dr. Mendiratta's opinions that Plaintiff would "'have a hard time holding any job' [due to difficulties] staying on task and paranoid [sic]," as well as that Plaintiff would not be able to get to any job on time and would have difficulty with understanding, comprehending, accepting criticism, and adjusting to changes. (PageID.51). He gave these opinions partial weight because they were "somewhat consistent with the available medical evidence summarized above and are supported by the provider's specialty and treating relationship" with Plaintiff. (*Id.*). Plaintiff's implicit challenge to a portion of this weight assessment is discussed below.

The ALJ also discussed the state agency psychological consultant's opinion that Plaintiff had mild limitations with activities of daily living; social functioning; and concentration, persistence, or pace, giving the opinions partial weight because they were "somewhat consistent with the available medical evidence . . . and are supported by the consultant's specialty and programmatic knowledge." (PageID.51-52). Finally, he made note of the GAF score assigned to Plaintiff in the medical records, but gave it little weight. (PageID.52). Plaintiff had not challenged the ALJ's assignment of weight to either the state agency psychological consultant's opinion or the GAF score.

Ultimately, the ALJ found Plaintiff to have mild limitations in understanding, remembering, or applying information, and moderate limitations with regard to concentrating, persisting, or maintaining pace. (PageID.47). He also found Plaintiff to have moderate limitations in interacting with others and mild limitations in adapting or managing himself. (*Id.*) The ALJ then crafted an RFC for Plaintiff that included the following occupational restrictions: no complex written or verbal instructions, a work environment free of fast-paced production requirements, and only occasional interaction with the general public and coworkers. (PageID.48). Plaintiff has not explained how these restrictions are insufficient to account for his mental limitations, or what additional restrictions would be required. *Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391–92 (6th Cir. 1999) (Plaintiff always bears the burden of demonstrating RFC limitations). I suggest, therefore, that the ALJ satisfied the spirit of 20 C.F.R. § 404.1520a(c)(2) and SSR 96-8p in discussing the medical and other evidence of Plaintiff's mental impairments.

As a final matter, Plaintiff recounts the medical records from Dr. Mendiratta at some length, focusing especially on Dr. Mendiratta's opinion that Plaintiff would have a hard time holding any job. (Doc. 13 at PageID.1004-1006). He then cites a Ninth Circuit case, *Hill v. Astrue*, 698 F.3d 1153, 1159–60 (9th Cir. 2012), in which the ALJ entirely failed to address a physician's opinion that the claimant's impairments "[made] the likelihood of sustained full time competitive employment unlikely." The Commissioner argued that the ALJ's failure to provide the physician's statement "*any* degree of review at all" was harmless because an opinion that someone cannot work intrudes on the ultimate issue of disability reserved to the Commissioner by 20 C.F.R. 404.1527(d)(1). *Id.* at 1160. The

Ninth Circuit disagreed, however, and distinguished the physician's statement as "not a conclusory statement like those described in 20 C.F.R. § 404.1527(d)(1), but instead an assessment, based on objective medical evidence, of [the claimant's] *likelihood* of being able to sustain full time employment." (*Id.*) (emphasis in original).

Although Plaintiff does not attempt to analogize his case to *Hill*, I can surmise Plaintiff seeks to attack the ALJ's assignment of "little weight" to Dr. Mendiratta's opinion that Plaintiff "is totally disabled from any gainful employment," (PageID.970), which the ALJ made because "disability determination is reserved strictly to the Commissioner." (PageID.51).

But *Hill* cannot help Plaintiff here. *Hill* is not binding on this Court—and besides, it rings discordant with SSR 96-5p, which clarifies what sort of statements intrude on matters reserved to the Commissioner.[2] SSR 96-5p (S.S.A.), 1996 WL 374183. That ruling observes that "[m]edical sources often offer opinions about whether an individual who has applied for . . . disability benefits is 'disabled' or 'unable to work.'" *Id.* at *5. Whether medical sources use those exact words "or make similar statements of opinions" or "offer opinions in other work-related terms" is irrelevant; the issue of whether an individual is disabled remains reserved to the Commissioner. *Id.* Here, Dr. Mendiratta stated that Plaintiff was "totally disabled from any gainful employment," which seems exactly the kind of statement contemplated by SSR 96-5p as commenting on an issue reserved to the Commissioner. And despite SSR 96-5p's cautioning that "[s]uch opinions on these issues

---

[2] SSR 96-5p was rescinded effective March 27, 2017, but remains relevant here because it was still in effect at the time Plaintiff filed his underlying claim.

must not be disregarded," the Sixth Circuit has held that the ALJ has a "good reason" to give "no weight" to a treating source statement when it is on an issue "reserved exclusively to the Commissioner." *Allen v. Comm'r of Soc. Sec.*, 561 F.3d 646, 651 (6th Cir. 2009).

Lastly, even if *Hill* were binding, this case is distinguishable. Unlike in that case, the ALJ did not outright ignore the evidence at issue. Instead, he simply assigned it less weight. For all the above reasons, Plaintiff's argument is unavailing.

### 2.  Plaintiff's RFC of medium work with additional limitations

Plaintiff attacks the ALJ's finding that he remained capable of medium work, even with additional limitations, based on its failure to account for his use of a cane and his need to attend numerous medical appointments, which would cause him to miss multiple days of work per month. (Doc. 13 at PageID.1010-1011).

Plaintiff "submit[s] that the record demonstrates that the plaintiff needs assistance from a cane to maintain balance," and notes that the VE testified Plaintiff would not be able to perform the jobs he had listed in response to the ALJ's hypothetical if Plaintiff needed to stand and use a cane with one hand. (*Id.* at PageID.1011). An ALJ is not required to include in his questions to the VE—or, by extension, his RFC assessment—any limitations that he does not find credible. *See Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993). Unfortunately, the ALJ did not explain why he apparently disbelieved that Plaintiff needed to use a cane to keep his balance due to his vertigo, despite finding Plaintiff's vertigo to be a severe impairment. Regardless, I suggest any error in the ALJ's failure to explain his reasoning is harmless, because the record does

22

not contain substantial evidence that Plaintiff needed to use a cane such that he requires a more restrictive RFC.

Social Security Ruling 96-9p[3] provides that for an ALJ

[t]o find a hand-held assistive device is medically required, there must be medical documentation establishing the need for a hand-held assistive device to aid in walking or standing, and describing the circumstances for which it is needed (*i.e.*, whether all the time, periodically, or only in certain situations; distance and terrain; and any other relevant information).

SSR 96-9p, 1996 WL 374185, at *7. The record here contains no such medical documentation. Plaintiff was never issued a prescription for or even advised by a physician to use a cane, at least so far as the record reveals. Further, neither he nor his wife indicated on their function reports that he used a cane. (PageID.229, 237). He has never reported a fall. He exhibited a normal gait at multiple appointments. (PageID.282, 284, 314, 501).[4]

---

[3] Again, I note that this SSR as a whole regards the "implications of a residual functional capacity for less than a full range of sedentary work." Although Plaintiff here was found limited to a range of *medium* work, the SSR is useful for its guidance on determining the necessity of hand-held assistive devices, and courts continue to consider it in similar cases. *E.g.*, *Wooley v. Comm'r of Soc. Sec.*, No. 1:11-cv-802, 2013 WL 204677, at *5 (S.D. Ohio Jan. 17, 2013), *rep. & rec. adopted*, 2013 WL 645857 (S.D. Ohio Feb. 21, 2013).

[4] Additionally, many of the post-onset records from Dr. Rahim include in the "physical examination" section the note "no gait and stance," which in context appears to mean a normal gait and stance; some of the reports note dizziness, but none mention Plaintiff's using a cane or prescribe a cane, or describe any difficulty walking or standing unassisted. (PageID.332, 335, 338, 341, 344, 347, 350, 353, 356, 359, 362, 365, 368, 371, 374, 377, 380, 383, 386, 389, 392, 395, 398, 401, 404, 407, 410, 413, 416, 422, 425, 428, 431, 528, 533, 538, 543, 548, 553, 558, 562, 567, 572, 577,582, 587, 592, 597, 602, 607, 612, 617, 626, 631, 636, 641, 646, 651, 656, 661, 666, 671, 680, 685, 690, 695, 699, 704, 709, 714, 719, 724, 729, 734, 739, 744, 749, 754, 759, 765, 769, 774, 779, 785, 790, 795, 799, 804, 810, 814, 819, 824, 829, 834, 839, 844, 849, 854, 859, 864, 869, 874, 879, 879, 884, 889, 894, 900, 905, 910, 915, 920, 925, 930, 935, 940, 945, 950, 955, 960, 961, 967).

And although Plaintiff used a cane on the day of the hearing, and testified that he used a cane "[m]ost of the time," he also said he tried as much as he could not to use it. (PageID.70). Thus, I suggest the ALJ did not err by failing to account for Plaintiff's use of a cane in his RFC. *See Carreon v. Massanari*, 51 F. App'x 571, 575 (6th Cir. 2002) ("Because the cane was not a necessary device for claimant's use, it cannot be considered an exertional limitation that reduced her ability to work.").

Further, even if a limitation were added that Plaintiff must use a cane, the VE testified that a reduced range of light work would remain available. (PageID.86). Thus, I suggest any error was harmless.

As for Plaintiff's conclusory statement that the frequency of his medical appointments renders him disabled, I agree with Defendant that Plaintiff's "bare assertion" does not suffice to present the argument. "Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to ... put flesh on its bones." *United States v. Stewart*, 628 F.3d 246, 256 (6th Cir. 2010) (citing *McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997)). Thus, I suggest Plaintiff cannot prevail on these grounds.

### 3.  The ALJ's assessment of Plaintiff's statements about his pain and functional limitations

Finally, Plaintiff argues that the ALJ did not properly assess his complaints of pain and his self-reported functional limitations. (Doc. 13 at PageID.1013). Plaintiff does not precisely pinpoint which limitations or complaints are at issue, but lists several parts of his

testimony: "Plaintiff testified that he receives injections that have been somewhat helpful. He takes pain medications that cause him to feel drowsy. Plaintiff testified that activity and movement exacerbates [sic] his pain level. He estimated that he could lift and carry up to 10 pounds. The plaintiff has mental impairments that interfere with his concentration." (Doc. 13 at PageID.1013-1014).

The Social Security regulations establish a two-step process for evaluating subjective symptoms, including pain. 20 C.F.R. § 404.1529(a) (2016); SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996). The ALJ evaluates complaints of disabling pain by confirming that objective medical evidence of the underlying condition exists. Here, the ALJ did in fact find that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms." (PageID.49).

At the next step, the ALJ determines whether that condition could reasonably be expected to produce the alleged pain or whether other objective evidence verifies the severity of the pain—and that is where the parties disagree. *See* 20 C.F.R. § 404.1529 (2016); SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996); *Stanley v. Sec'y of Health & Human Servs.*, 39 F.3d 115, 117 (6th Cir. 1994). The ALJ here explained that Plaintiff's "statements concerning the intensity, persistence, and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." (PageID.49).

Credibility determinations regarding a claimant's subjective complaints rest with

the ALJ.[5] *See Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987). Courts give "great weight and deference" to an ALJ's evaluation of a claimant's subjective statements—generally, an ALJ's credibility assessment can be disturbed only for a "compelling reason." *Sims v. Comm'r of Soc. Sec.*, 406 F. App'x 977, 981 (6th Cir. 2011); *Daniels v. Comm'r of Soc. Sec.*, 152 F. App'x 485, 488–89 (6th Cir. 2005); *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 392–93 (6th Cir. 2004).

Plaintiff spends several pages recounting favorable record evidence, (PageID.1014-1016); so long as the ALJ's findings are supported by substantial evidence, however, it is irrelevant whether substantial evidence also supports a different outcome. *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). The ALJ here discussed the medical and other evidence at some length, (PageID.49-52), and specifically noted that "[w]hile cervical and lumbar pathology have been noted on radiology studies, the claimant has received conservative management of his chronic pain complaints, including medication management and injections." (PageID.51). And "[m]usculoskeletal and neurological examinations have been routinely unremarkable." (*Id.*). Though Plaintiff "has fairly consistently complained of dizziness, . . . no objective cause has yet been

---

[5] Although the Commissioner has rescinded SSR 96-7p and eliminated the term "credibility" from Administration policy, SSR 16-3p, 2016 WL 1119029, at *1 (Mar. 16, 2016), the underlying regulation remains materially unchanged, *see* 20 C.F.R. § 404.1529(c), and I agree with the courts in this district that have continued to apply SSR 96-7p to cases arising prior to its rescission. *See, e.g.*, *Cooper v. Comm'r of Soc. Sec.*, No. 16-cv-13477, 2017 WL 3923984, at *3 (E.D. Mich. August 21, 2017), *Rep. & Rec. adopted by* 2017 WL 3891971 (E.D. Mich. Sept. 9, 2017); *Tuttle v. Comm'r of Soc. Sec.*, No. 16-11144, 2017 WL 2928021, at *6 n. 3 (E.D. Mich. June 9, 2017), *Rep. & Rec. adopted by* 2017 WL 2905125 (E.D. Mich. July 7, 2017).

found." (*Id.*). The ALJ went on to acknowledge, however, that Plaintiff "does have some mild to moderate hearing loss." (*Id.*). He also found that Plaintiff's mental health impairments had been managed with medication, and pointed to occasions on which Plaintiff's concentration and attention were noted to be good. (*Id.*).

I suggest, therefore, that the ALJ's opinion was supported by substantial evidence, and Plaintiff has failed to present a "compelling reason" sufficient to disturb the ALJ's assessment of his subjective complaints and limitations.

### H. Conclusion

For the reasons stated above, the Court **RECOMMENDS** that Plaintiff's Motion for Summary Judgment, (Doc. 13), be **DENIED**, the Commissioner's Motion for Summary Judgment, (Doc. 16), be **GRANTED**, and this case be **AFFIRMED**.

### III. <u>REVIEW</u>

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have

to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Dakroub v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date:  November 7, 2018                          S/ PATRICIA T. MORRIS
                                                 Patricia T. Morris
                                                 United States Magistrate Judge

## CERTIFICATION

I hereby certify that the foregoing document was electronically filed this date through the Court's CM/ECF system which delivers a copy to all counsel of record.

Date: November 7, 2018                           By s/Kristen Castaneda
                                                 Case Manager